ORAL ARGUMENT NOT YET SCHEDULED
No. 12-1485

—————————————————

THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————————

VILLAGE OF BARRINGTON, ILLINOIS,
Petitioner,

v.

SURFACE TRANSPORTATION BOARD and
UNITED STATES OF AMERICA,
Respondents.

—————————————————

ON PETITION FOR REVIEW OF AN ORDER OF
THE SURFACE TRANSPORTATION BOARD

—————————————————

OPENING BRIEF OF PETITIONER

—————————————————

<div style="margin-left:40%">

Richard H. Streeter
Law Office of Richard H. Streeter
5255 Partridge Lane, N.W.
Washington, D.C. 20016
(202) 363-2011

Attorney for Petitioner
Village of Barrington, Illinois

</div>

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

   **(A)  Parties and Amici.**

        **1.    Parties Before the Agency**

   The following parties appeared in the proceeding below before

the Surface Transportation Board in Finance Docket No. 35087

(Sub-No. 8):

Petitioner:       Village of Barrington, Illinois

   As a municipality, Barrington is a governmental entity that

does not issue stock and is not subject to the corporate disclosure

statement requirements of Fed. R. App. P. 26.1 and Circuit Rule

26.1.

Governmental and Quasi-Governmental Agencies:

Chicago Metropolitan Agency for Planning

Municipalities:

Barrington Township, Illinois
Village of Cary, Illinois
Village of Tower Lakes, Illinois
Village of South Barrington, Illinois
Village of Lake Barrington, Illinois
Village of Palatine, Illinois
City of Crystal Lake, Illinois
City of Aurora, Illinois

Elected and Other Government Officials:

Honorable Robert Dold, U.S. Representative
Honorable Richard J. Durbin, U.S. Senator
Honorable Mark Kirk, U.S. Senator
Honorable Donald Manzullo, U.S. Representative
Honorable Peter J. Roskam, U.S. Representative
Honorable Joe Walsh, U.S. Representative

Companies:

Canadian National Railway Company and Grand Trunk Corporation

*Amici*:     There were no *amici* that appeared before the agency.

## 2.     Parties Before the Court

The parties that appeared before the Surface Transportation Board and that now appear before this Court are:

Village of Barrington, Illinois          Petitioner

Surface Transportation Board          Respondent

United States of America          Respondent

Canadian National Railway Company          Intervenor

Grand Trunk Corporation          Intervenor

*Amici:* There are no *amici* before this Court on Appeal.

**(B)   Ruling Under Review**

The ruling under review is the Surface Transportation Board's final decision and order in *Canadian National Railway Company and Grand Trunk Corporation—Control—EJ&E West Company,* STB Finance Docket No. 35087 (Sub-No. 8) [Barrington Petition for Mitigation] (served November 8, 2012) ("*Oversight Decision*").

The Board's decision became final for the purposes of judicial review on the date it was served under 49 U.S.C. § 722(d) and the Board's regulations.

**(C)   Related Cases.**   There are no other pending cases related to Finance Docket No. 35087 (Sub-No. 8).  However, the Board's prior decision in *Canadian National Railway Company and Grand Trunk Corporation—Control—EJ&E West Company,* STB Finance Docket No. 35087 (*Final Decision,* served December 24, 2008) was previously affirmed by this Court by decision issued March 15, 2011, in Case No. 09-1002, *et al, Village of Barrington v. STB*, 636 F.3d 650 (D.C. Cir. 2011).  In its decision, this Court affirmed the Board's decision authorizing CN to acquire control of EJ&E West Company subject to a condition that required CN to pay a significant portion of the cost of grade separations located in

iii

Aurora, Illinois and Lynwood, Illinois.  The Court denied various NEPA challenges advanced by the multiple Community Petitioners, which included Barrington.  The Court declined to consider certain of Barrington's issues related to its 2008 traffic study because the Community Petitioners did not raise those issues in their joint opening brief.  No party challenged the Board's retention of jurisdiction to impose additional conditions and take other action to address matters related to operations following the transfer of control.  Barrington's current challenge relates to the Board's denial of its petition, filed October 14, 2011, seeking imposition of additional mitigation pursuant to the Board's continuing oversight jurisdiction and, in the alternative, seeking to reopen the proceeding.  Barrington's petition was based on a post-Acquisition traffic study that was conducted in 2011 that, among other things, presented the Board with a comparative analysis of the impact of CN's actual operations over the EJ&E at both the U.S. Route 14 crossing in Barrington and the U.S. Route 34 crossing in Aurora, Illinois.

Respectfully submitted,

/s/ Richard H. Streeter

_____

Richard H. Streeter
Law Office of Richard H. Streeter
5255 Partridge Lane, N.W.
Washington, D.C. 20016
(202) 363-2011
Counsel for the Village of
Barrington, IL

Dated:  April 26, 2013

**TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................................................................. i

TABLE OF CONTENTS ............................................................vi

TABLE OF AUTHORITIES...........................................................ix

GLOSSARY.......................................................................xi

JURISDICTIONAL STATEMENT ................................................. 1

ISSUES PRESENTED FOR REVIEW ......................................... 3

STATUTES AND REGULATIONS ............................................... 5

STATEMENT OF FACTS .......................................................... 5

   A. BACKGROUND ............................................................. 5

   B. THE POST-ACQUISITION VISSIM PROJECTIONS AND PROCEEDING ........................................................... 12

SUMMARY OF ARGUMENT .................................................... 17

STANDING .......................................................................... 24

ARGUMENT ........................................................................ 25

I. Standard of Review............................................................ 25

II. In Its *Oversight Decision*, The Board Arbitrarily And Capriciously Failed To Take A Hard Look At Barrington's New Evidence That Is Based On CN's Post-Acquisition Operations Over The EJ&E Line And Demonstrates That The Adverse Impacts Of CN's Increased Operations In Barrington Are Virtually Identical To The Adverse Impacts At The Similarly Situated U.S. Route 34 Crossing In Aurora, Which Was Awarded

Grade-Separation Mitigation In The Board's *Final Decision.*. 26

   A.  Civiltech's 2011 VISSIM Study conclusively demonstrates that a single grade separation at the U.S. Route 14 crossing will benefit the Barrington transportation network by countering the adverse impact of CN's additional rail operations without requiring CN to mitigate any preexisting congestion. ..................................................... 27

   B.  Because Barrington's 2011 VISSIM Study is the only evidence that reflects the actual impact of CN's post-Acquisition operations over the EJ&E line at the crossings at both U.S. Routes 14 and 34, it is both new and timely. ............................................................. 35

   C.  The Board has not provided an adequate explanation to justify its irrational, disparate treatment of the U.S. Route 14 crossing vis-à-vis similarly situated crossings, particularly those at U.S. Routes 34 and 30. .................. 41

   D.  The Board's focus on preexisting congestion caused it to fail to take a hard look at the *actual* environmental consequences of its oversight action. ............................. 49

   E.  The Board has not identified any error in Barrington's projections regarding the impact of constructing a grade separation at the U.S. Route 14 crossing. ....................... 52

III.  In Light Of The Uncontested Evidence Of Record That Demonstrated That Prior Findings Were Based On Inaccurate, Incomplete And Misleading Information, The Board's Refusal To Reopen Pursuant To Its Governing Regulations And Oversight Jurisdiction Is Arbitrary and Capricious. ............ 55

   A.  The Board's refusal to acknowledge the inaccurate, incomplete and misleading information in the VOBTOA is arbitrary and capricious. ........................................... 59

B.  In responding to the methodological errors identified by Civiltech, the Board distorts the record and Barrington's position. ........................................................................ 66

CONCLUSION ........................................................................ 68

CERTIFICATE OF COMPLIANCE ........................................... 69

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

## Cases

Am. Radio Relay League, Inc. v. FCC, 524 F.3d 277
(D.C. Cir. 2008) ..................................................................... 25

AT&T Wireless Services, Inc. v. FCC, 270 F.3d 959
(D.C. Cir. 2001) ..................................................................... 65

*Bowman Transportation, Inc. v. Arkansas-Best Freight System,
Inc., 419 U.S. 281 (1974) ........................................ 25, 36, 51

*Burlington Northern and Santa Fe Railway Company v. Surface
Transportation Board, 403 F.3d 771 (D.C. Cir. 2005) .......... 41

Burlington Truck Lines, Inc. v. U.S., 371 U.S. 156 (1962) ......... 51

*Fritsch v. I.C.C., 59 F.3d 248 (D.C. Cir. 1995).................... 26, 40

*Jost v. STB, 194 F.3d 79 (D.C. Cir. 1999) ............................... 26

*Motor Vehicle Mfrs. Assn. v. State Farm Mutual,
463 U.S. 29 (1983) ................................................................ 51

Village of Barrington v. STB, 636 F.3d 650 (D.C. Cir. 2011)... 2, 25

*Authorities upon which the Village of Barrington chiefly relies.

## Statutes

5 U.S.C. § 702 ............................................................................ 24

5 U.S.C. § 706(2)(A) ................................................................... 25

28 U.S.C. § 2321 .......................................................................... 3

28 U.S.C. § 2323 ........................................................................ 24

28 U.S.C. § 2342(5) ....................................................................... 3

28 U.S.C. § 2343 ............................................................................ 3

28 U.S.C. § 2344 ............................................................................ 2

28 U.S.C. § 2349 ............................................................................ 3

42 U.S.C. § 4332 ............................................................................ 7

49 U.S.C. § 722(c) .......................................................................... 2

49 U.S.C. § 722(d) ................................................................... iii, 2

49 U.S.C. § 11324 .......................................................................... 1

## Regulations

49 C.F.R. § 1115.4 ......................................................................... 2

# Glossary

| | |
|---|---|
| ADT | Average Daily Traffic |
| Board or STB | Surface Transportation Board |
| Civiltech | Civiltech Engineering, Inc. (the third-party contractor hired by the Village of Barrington, IL to evaluate the impacts of CN's acquisition of the EJ&E on traffic mobility and congestion in the Village) |
| CN | Canadian National Railway Company & Grand Trunk Corporation |
| CWT CIRCUITRY | Constant Warning Time circuitry |
| DEIS | Draft Environmental Impact Statement |
| EJ&E | Elgin Joliet and Eastern Railway Company |
| EJ&E Line | Belt rail line acquired by CN as a Chicago bypass route |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| Final Decision | STB's December 24, 2008 Decision in STB Finance Docket No. 35087 approving CN's acquisition of the EJ&E |
| HDR | HDR, Inc. (the third-party contractor for the Board that prepared the VOBTOA and assisted in preparing the EIS) |
| IDOT | Illinois Department of Transportation |

| | |
|---|---|
| OEA | The Board's Office of Environmental Analysis f/k/a Section of Environmental Analysis (SEA) |
| Oversight Decision | STB's November 8, 2012 Decision in STB Finance Docket No. 35087 (Sub-No. 8) denying Barrington's petition for grade separation mitigation and reopening |
| Post-Acquisition | Dates, events and railroad operations on the EJ&E line after CN's consummation of its acquisition of EJ&E on January 31, 2009 |
| SRA | Strategic Regional Arterials |
| Stay Decision | STB's January 15, 2009 Decision in STB Finance Docket No. 35087 |
| SVS | Supplemental Verified Statement |
| VISSIM | VISSIM is a microscopic time step and behavior-based simulation program developed to model urban traffic and operations. |
| VM | Voluntary Mitigation |
| VOBTOA Study | Village of Barrington Traffic Operational Analysis prepared by HDR, Inc. for OEA in 2008 based on AM and PM peak hours |
| 2008 VISSIM Study | Study prepared by Civiltech in 2008 to contest DEIS findings regarding the projected impact on at-grade rail/highway crossings in the Village based on 24 hours per day |

| 2011 VISSIM Study | Study prepared by Civiltech in 2011 to determine post-Acquisition impacts of CN's expanded rail operations through the Village and at U.S. Route 34 in Aurora based on 24 hours per day of actual CN operations |
| --- | --- |
| VS | Verified Statement |

## JURISDICTIONAL STATEMENT

In its *Final Decision* approving CN's acquisition of control of EJ&E, the Board, pursuant to its jurisdiction under 49 U.S.C. § 11324, established an initial 5-year monitoring and oversight condition and retained jurisdiction to assess "the various service and other impacts of the transaction, and the effectiveness of the various conditions" it had imposed on the transaction.[1]  It explicitly retained jurisdiction to "impose additional conditions and take other action" to address matters related to CN's post-Acquisition operations.[2]  No party challenged the Board's retention of oversight jurisdiction, which was subsequently extended to January 2015 following the Board's determination that CN had knowingly violated the Board's order mandating CN status reports on blocked crossings on the EJ&E line.[3]

Following CN's acquisition of control of EJ&E on January 31, 2009, and the filing of this Court's decision on March 15, 2011,[4]

---

[1] *Final Decision* at 25 (JA ___).

[2] *Id.* at 26 (JA __).

[3] *See* Decisions Nos. 26 and 27, served December 21, 2010, in FD No. 35087, *Canadian Nat'l Ry. & Grand Trunk Corp.—Control—EJ&E West Co.* (J.A. ____).

[4] *Village of Barrington v. STB,* 636 F.3d 650 (D.C. Cir. 2011).

1

Barrington, on October 14, 2011, petitioned the Board requesting imposition of additional mitigation pursuant to the Board's continuing oversight jurisdiction. In the alternative, Barrington requested the Board to reopen the proceeding, pursuant to 49 U.S.C. § 722(c) and 49 C.F.R. § 1115.4, based on changed circumstances and material error. Barrington's petition featured previously unavailable, post-Acquisition evidence reflecting the actual impact of CN's operations on the line.

In response, the Board created a sub-docket, FD 35087 (Sub-No. 8), for adjudicating Barrington's petition. CN replied to Barrington's petition on November 3, 2011. Barrington filed a rebuttal on November 14, 2011, to which CN replied on December 5, 2011.

On November 8, 2012, the Board served its *Oversight Decision* denying Barrington any relief. On December 26, 2012 – within 60 days of service of the *Oversight Decision*, in accordance with 28 U.S.C. § 2344 – Barrington timely petitioned this Court for judicial review.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 2321, 2342(5) and 2349. Venue is proper under 28 U.S.C. § 2343.

2

## ISSUES PRESENTED FOR REVIEW

1) In its *Final Decision*, the Board awarded grade-separation mitigation that required CN to pay for a significant portion of the cost for grade separations at the U.S. Route 34 (Ogden Avenue) crossing in Aurora, IL and at the U.S. Route 30 (Lincoln Highway) crossing in Lynwood, IL.  In 2011, Barrington introduced new evidence reflecting virtually identical site-specific adverse effects of CN's post-Acquisition operations at both the U.S. Route 14 (Northwest Highway) crossing in Barrington and the U.S. Route 34 crossing in Aurora, Illinois.  The issue is whether the Board in its *Oversight Decision* acted arbitrarily and capriciously and subjected the Barrington crossing to disparate treatment when it declined to impose grade-separation mitigation in response to Barrington's new evidence.

2) Barrington's new evidence demonstrated that grade separating the U.S. Route 14 crossing from the EJ&E line would reduce projected total 24-hour vehicle delays attributed to CN's operations on IL Route 59 and U.S. Route 14 to nearly the levels expected under the No-Acquisition scenario.  The Board denied grade-separation mitigation based on it prior 2008 finding of

3

preexisting traffic congestion without addressing the substantial
benefits predicted by Barrington's new 2011 evidence.  The issue is
whether the Board acted arbitrarily and capriciously when it failed
in its *Oversight Decision* to take a "hard look" at the new evidence
which rebutted its prior findings.

3)  The Board's decision not to reopen flows from a previously
untested Board conclusion that a single grade separation would not
address congestion.  That conclusion was based on inaccurate,
incomplete and misleading information gleaned from a pre-
transaction "peak-period" analysis that considered only two hours
of daily train operations, rather than any new analysis that either
responded to or refuted Barrington's new evidence.  The issue is
whether the Board acted arbitrarily and capriciously when it
refused to reopen even though new evidence, based on 24 hours of
train operations, reveals that a single grade separation would
address regional congestion caused solely by CN's increased freight
operations.

## STATUTES AND REGULATIONS

Pertinent statutory and regulatory provisions are reprinted in the attached addendum to this brief.

## STATEMENT OF FACTS

**A.** **Background.** In October 2007, CN filed its application with the Board to acquire control of EJ&E. Because that transaction was projected to increase the number of trains traveling through Barrington from 5 per day to over 20 per day, Barrington recognized that the transaction would have a significant negative effect on pedestrian, bicycle and automobile traffic operations in Barrington, especially at its four EJ&E at-grade crossings.

Barrington, which is located in the northwest area of the greater Chicago region, is the central hub community for the multiple communities that surround it.  In addition to crossing the UP's railroad line, the EJ&E rail line crosses four roadways at grade in a span of 5,918 feet within Barrington's village limits.  The roadway crossings are at Lake Zurich Road, U.S. Route 14 (a/k/a Northwest Highway), IL Route 59 (a/k/a Hough Street) and Main Street (a/k/a Lake Cook Road).  Two of those roadways, U.S. Route 14 and IL Route 59, have been designated as Strategic Regional

Arterials ("SRA") by IDOT. Of particular importance, U.S. Route 14 serves the northwest portion of the greater Chicago region from Cook County to the Wisconsin border.

The closest grade-separated crossings are at IL Route 62 in Barrington Hills – 4 to 5 roadway miles from the Main Street crossing; and at U.S. Route 12 in Lake Zurich – 4 to 6 roadway miles from U.S. Route 14 crossing. Because the average length of a freight train run by CN was projected to be 6,800 feet (and already are as long as 10,000 feet-plus)[5], a single freight train has the potential to block all four major roads, which would deny emergency access to the Good Shepard Hospital, which is located to the Northwest of the EJ&E line, as well as interfere with other emergency responses within the Village. A stalled train would also block UP's freight and commuter operations that intersect with the EJ&E line in Barrington on a regular basis throughout a 24-hour period.

In order to address anticipated significant adverse environmental impacts, the Board determined that preparation of an Environmental Impact Statement would be appropriate to fulfill

---

[5] See 2011 VISSIM Study at Table A-3 (JA __).

the Board's obligations under NEPA, 42 U.S.C. 4332. In preparing the DEIS, OEA examined 112 crossings along the EJ&E line to determine whether they would experience projected average daily traffic (a/k/a "ADT") volumes over the crossings of 2,500 or more vehicles per day. OEA then examined 87 crossings that satisfied that initial threshold to determine which crossings would be considered "substantially affected" by meeting or exceeding at least one of three threshold criteria. The three threshold criteria used to determine whether a crossing would be "substantially affected" are:

> (1) crossing level of service (LOS)* (where a crossing was at or over capacity and would be reduced to a Crossing LOS of E or F as a result of the transaction); (2) effects on queue length (where a transaction-related queue length would block another roadway that would not otherwise be blocked); and (3) total amount of delay for all vehicles stopped at a crossing (where a crossing would experience more than 40 hours of total transaction-related vehicle delay in a 24-hour period).* (* footnotes omitted).[6]

In its DEIS, OEA concluded that the IL Route 59 crossing in Barrington would be substantially affected due to increased queue lengths. However, OEA determined that "U.S. Route 14, did not

---

[6] *Oversight Decision* (p. 3, footnotes omitted)(JA __).

meet or exceed any of the three thresholds, and thus was not considered 'substantially affected' under the screen criteria."[7]

In order to assess the validity of the DEIS conclusions and to develop accurate estimates of the impacts of the Acquisition on the Barrington crossings, Barrington asked Civiltech to perform a sophisticated VISSIM Study of the Barrington transportation network.  The results of that study, which were filed with the Board on September 30, 2008, were based on a 24-hour period of operations and projected an increase of at least 135 hours of daily delay at the U.S. Route 14 crossing over the No-Action scenario.  In addition, Barrington's Comments identified multiple technical flaws in the DEIS methodology that came to light as a result of consulting with Civiltech.

In response to "concerns regarding worsening of the Barrington community congestion and mobility resulting from the Proposed Action"[8] expressed during the Barrington DEIS public meeting held on August 27, 2008, HDR was directed to perform a

_____

[7] *Oversight Decision* at 4 (JA ___).

[8] VOBTOA at 1 (JA ___). The Barrington DEIS meeting, which was held at the high school gym, was attended by 5,111 members of the general public and several members of Congress.  All voiced strong concerns about the DEIS.

8

Barrington-specific VISSIM analysis for OEA. In addressing

potential mitigation, HDR's study, the VOBTOA, involved solely an

"[a]nalysis of reasonable and feasible alternatives for mitigation of

the serious transportation system effects of the queuing predicted

for the [*Il Route 59*] *and EJ&E line at-grade crossing.*" [9]

Data used in HDR's VOBTOA Study was collected in

September 2008. Instead of gathering data directly related to the

four crossings in Barrington over a 24-hour period, only "AM and

PM peak hour [vehicular turning movement counts (TMCs)] were

collected at the signalized and unsignalized intersections along the

corridors in the study area."[10]  In addition, 24-hour counts "were

collected at twelve (12) locations in the study area and were focused

on the outskirts of the limits of the study area", but not on the

actual crossings.[11] HDR's VOBTOA analysis only included one train

during each peak hour and did not account for the cumulative

effects of successive train events.

Unlike the DEIS which addressed specific crossings, HDR's

VOBTOA did not project total hours of vehicle traffic delay at any

---

[9] VOBTOA at 47 (emphasis added) (JA ___).
[10] VOBTOA at 10 (JA ___).
[11] *Id.*

9

specific crossing along the entire EJ&E line.  When the FEIS was
released on December 5, 2008, it simply updated the hours of delay
reflected in the DEIS for over 90 EJ&E crossings in Indiana and
Illinois that had been determined using OEA's rudimentary
analysis.  Therefore, the hours of delay in the FEIS relative to the
four Barrington crossings had no connection with HDR's 2008
VOBTOA Study.  Nevertheless, in its *Oversight Decision,* the Board
attributed the source of the total vehicle delay data in Table A.5-1 of
the FEIS to the VOBTOA and again projected that less than 40
hours of additional daily delay would be experienced at the U.S.
Route 14 crossing post-Acquisition.[12]

Although it did not compute hours of delay, HDR's peak-
period VOBTOA projected substantial queue length *increases* over
the No Action scenario at the U.S. Route 14 crossing of up to 2,100
feet for westbound movements that took more than twenty minutes
to dissipate in the PM peak.[13]  During the AM peak period,
eastbound and westbound maximum queue lengths at that specific
crossing increased up to 1,750 feet and 500 feet, respectively, over

---

[12] *Oversight Decision* at 19 (JA __).
[13] VOBTOA at 46 (JA ___).

the No Action scenario.  Despite acknowledging those lengthy

increases, HDR, in its VOBTOA, never mentioned that the U.S.

Route 14 crossing satisfied the queue length criterion to be

designated as "substantially affected."  Instead, OEA claimed that

HDR's "traffic analysis also validated [OEA's] methodology for

evaluating traffic delay and mobility effects [and] confirmed the

conclusions that [OEA] reached in the Draft EIS."[14]

The procedural schedule adopted by the Board did not allow

comments to the FEIS.  Therefore, Barrington had no opportunity

before the Board issued its *Final Decision* to conduct an updated

VISSIM Study in order respond to and demonstrate the erroneous

nature of the new, unique peak-period analysis that was first

introduced in the VOBTOA.

On December 24, 2008, only 19 days after the FEIS was

released to the public, the Board served its *Final Decision*.  The

Board denied Barrington any grade-separation mitigation based on

HDR's conclusion in the VOBTOA that "the Barrington area total

delay time would increase by 4% and 5% during the AM and PM

---

[14] FEIS, 2-49 (JA ___)

11

peak periods."[15]  Barrington's VISSIM projections about delays exceeding the 40-hour threshold were not mentioned, much less challenged, in the FEIS or the *Final Decision*.  The Board did announce that it was retaining jurisdiction to impose additional conditions "to address matters related to operations following the transfer of control."[16]

> **B.    The Post-Acquisition VISSIM Projections And Proceeding.**

In March 2011, this Court affirmed the Board's authority to require CN to pay a major portion of the cost of constructing the grade separations in Aurora and Lynwood.  Thereafter, in reliance on the Board's unchallenged oversight jurisdiction, Barrington requested Civiltech to prepare a new VISSIM Study that would reflect CN's post-Acquisition operations and analyze the potential delay reduction benefits of a grade separation at the U.S. Route 14 crossing.  Civiltech was also asked to perform an identical VISSIM Study at the U.S. Route 34 crossing in Aurora.  In addition, Civiltech was asked to review and assess the methodology of HDR's

---

[15] *Final Decision* at 45, n.101 (JA ___).
[16] *Final Decision* at 26 (JA __).

12

peak period VISSIM analysis that was the basis of its 2008 VOBTOA and OEA's FEIS conclusions regarding the Barrington area.

Although CN had not yet reached the total volume of daily trains through Barrington or Aurora that were projected in its application, the new evidence was based on actual CN train operational data that Civiltech collected between May 12 and June 15, 2011, which reflected 24 hours of daily operations within that month-long span of time.  It also reflected multiple trains in excess of 10,000 feet long.[17]

Based on Civiltech's analysis, on October 14, 2011, Barrington filed its *Petition Seeking Imposition of Additional Mitigation Pursuant to the Board's Oversight Jurisdiction and Reopening Pursuant to Governing Regulations* ("*Petition*"), to which a copy of Civiltech's 2011 VISSIM Study was attached.  As was explained, the new evidence reflecting CN's post-Acquisition operations over the EJ&E line demonstrated the need for a grade separation at U.S. Route 14. It also confirmed the material error caused by the Board's past reliance on HDR's misleading and truncated VOBTOA analysis.

---

[17] *2011 VISSIM* at Table A-1 (JA ____).

13

In its Petition, Barrington summarized the results of the 2011 VISSIM Study, including the projections that a single grade separation at the U.S. Route 14 crossing would produce a substantial benefit to the entire Village roadway network and would reduce the delays on both IL Route 59 and U.S. Route 14 to nearly the levels expected under the No-Action scenario.  Barrington also showed that CN's post-Acquisition operations had a similar impact on the U.S. Route 14 grade crossing in Barrington as they had on the U.S. Route 34 crossing in Aurora, IL.  In addition, Civiltech observed that the total delay calculations reflected in Table A.5-1, which was published in Appendix A of the FEIS, "were based on the original rudimentary delay calculations rather than on any VISSIM analyses in HDR's VOBTOA."[18]

In response, CN argued that Barrington was relying on old evidence and arguments and, therefore, had demonstrated no changed circumstances, no error, and no materiality.  CN specifically challenged Civiltech's statement that "[t]he proximity of rail crossings along the CN line in Barrington necessitate the activation of warning signals at nearby crossings in tandem, rather

---

[18] 2011 VISSIM at 7 (JA ___).

14

than providing constant advance warning times at each crossing."[19] As CN explained, after acquiring the EJ&E line, it upgraded the system in 2010 so each of the four highway-rail at-grade crossings are now governed by constant warning timing (CWT) circuitry that eliminated tandem activation of warning signals and the resulting excessive warning times.[20]

To correct the record, Barrington sought leave to file rebuttal evidence based on revised data calculations that reflected CN's installation of CWT circuitry. This new evidence caused projected total delay at the Route 14 crossing to be reduced from 116 hours to 98 hours. However, the total delay at IL Route 59 increased from 64 hours to 91 hours as a result of installing CWT circuitry. As also noted, "despite the delay reduction benefits of the CWT devices, the Transaction has still resulted in substantial traffic delays and queue lengths at both the SRA routes running through the downtown Barrington area."[21] CN filed a Reply urging the Board to reject Barrington's rebuttal evidence. In the interest of a more

---

[19] V.S. Mark Ryon at 2 (JA ___).

[20] *Id.* at 2 (JA ___).

[21] Supplemental V.S. Andres at 3.

15

complete record, the Board accepted Barrington's rebuttal evidence and CN's reply into the record.[22]

On November 8, 2012 the Board issued its decision denying any relief to Barrington. Although it tacitly acknowledged that the evidence demonstrated that U.S. Route 14 would be substantially affected, the Board denied relief based on HDR's pre-Acquisition 2008 peak-period VOBTOA that suggested a grade separation would provide minimal benefit to traffic flow in the Barrington area, primarily due to preexisting congestion. Although the Board accepted all of Barrington's new evidence, including its rebuttal evidence, it concluded that the new evidence would not "materially affect the outcome of the Board's *Final Decision* and warrant the imposition of an additional condition requiring CN to construct the requested grade separation."[23] In addition, the Board denied Barrington's request that it reject HDR's unique 2008 peak-period VOBTOA, whose significant flaws were exposed by Civiltech's post-Acquisition VISSIM Study.[24]

---

[22] *Oversight Decision* at 8 (JA ___).
[23] *Oversight Decision* at 2 (JA ___)
[24] *Id.* 16-20 (JA ___)

16

## SUMMARY OF ARGUMENT

The Board's conclusion that the new evidence in Civiltech's 2011 VISSIM Study "is insufficient to warrant reopening because the updated study would not affect the outcome of the Board's prior decision" is arbitrary and capricious and contrary to uncontroverted evidence.[25]  In reaching that conclusion, the Board ignored several critical aspects of the 2011 VISSIM Study.  First, the Board never mentioned that "[t]he VISSIM modeling in Barrington predicted a substantial benefit to the Village roadway network as a result of grade separating the U.S. Route 14 crossing."[26]  Nor did it question Barrington's prediction "[t]hat grade separation would reduce 2015 total 24-hour vehicle delays on both IL Route 59 and U.S. Route 14 to nearly the levels expected under the No-Acquisition scenario."[27]

Third, the Board ignored Barrington's related finding that a single grade separation at the U.S. Route 14 crossing would negate only the 98 additional hours of daily delay that are *solely* attributed to CN's increased rail operations over the EJ&E line.  Therefore, CN would not be contributing to the cost of mitigating pre-Acquisition

---

[25] *Oversight Decision* at 9 (JA __).
[26] 2011 VISSIM at 22 (JA ___).
[27] *Id.*

17

congestion, but would be responsible only for the additional congestion caused by its own operations if it were required to fund a significant cost of constructing a single grade separation in Barrington.

The Board made no apparent attempt to evaluate or challenge the conclusions reached by Civiltech in its 2011 VISSIM report. Instead, it defaulted back to the 2008 VOBTOA to deny Barrington relief.  Without any new analysis from HDR regarding the validity of Civiltech's 2011 projections and conclusions,[28] the Board reiterated HDR's 2008 assertion that "construction of a grade separation alone at either the [IL Route 59] or [U.S. Route 14] crossings is not a feasible way to address regional congestion due to capacity constraints at existing signalized intersections."[29]  Nor did the Board reexamine its 2008 assertion in the FEIS that "a grade separation at U.S. 14 would have 'minimal benefit to traffic flow' in the area due to existing congestion caused by multiple nearby

_____

[28] As the Board acknowledged at pp. 2 and n.6 of the Oversight Decision, it must depend on third-party contractors, such as HDR and Civiltech, which have the expertise that the Board lacks, to perform the highly technical studies, such as the VISSIM Studies that were prepared by HDR and Civiltech in this case.

[29] VOBTOA at 48 (JA ___).

18

traffic signals, as well as the nearby location of the UP/Metra rail line that created substantial queuing along Hough Street and U.S. 14."[30]

Because Civiltech took all of those factors into account in determining that substantial benefits would be realized by a single grade separation at U.S. Route 14, a hard look at its post-Acquisition 2011 VISSIM results would require some measure of analysis pursuant to the Board's oversight jurisdiction. There was none. Instead, the Board relied solely on OEA's prior findings without attempting to confirm the validity of the new evidence that squarely contradicted OEA's key findings and, thereby, raised serious questions as to whether OEA's findings were based on inaccurate, incomplete and misleading information.

The Board's assertion that Barrington's new evidence is immaterial will not survive close scrutiny. In essence, the Board's *Oversight Decision* boils down to the insupportable conclusions that it is immaterial that (i) Barrington's post-Acquisition evidence reflects approximately 100 hours of daily delay that are solely attributed to additional CN train operations; (ii) increased rail

---

[30] *Oversight Decision* at 12 (JA \_\_\_\_).

operations will cause lengthy queues that block other crossings and do not dissipate for over 20 minutes; and (iii) the 2011 VISSIM study, by comparing the actual impact of CN's post-Acquisition operations at the U.S. Route 14 crossing with the impact at the U.S. Route 34 crossing, demonstrates that those similarly situated crossings have been treated in a dissimilar fashion.

Civiltech's 2011 VISSIM Study was undertaken pursuant to the Board's retention of jurisdiction to monitor post-Acquisition rail operations and impose additional conditions. This study provides an apples-to-apples comparison of the at-grade crossings at U.S. Routes 14 and 34 that is based on post-Acquisition evidence that could not have been generated prior to CN's commencement of operations. It demonstrates that the U.S. Route 14 crossing in Barrington is being "substantially affected" by CN's operations over the EJ&E line. It also demonstrates that when the U.S. Route 14 crossing in Barrington is subjected to the same standards that were applied to the U.S. Route 34 crossing in Aurora, it too is entitled to grade separation relief paid for by CN.

In refusing to impose additional conditions, the Board acknowledged that "the updated 2011 VISSIM Model could be

20

viewed as new evidence insofar as it contains some more recent CN operational data."[31]  However, after noting that the new VISSIM Study projected less delay than had been projected earlier in the proceeding by Barrington (but which was never acknowledged, discussed, or refuted in the VOBTOA, the FEIS or the *Final Decision*), the Board summarily declared, that this uncontroverted, new 2011 evidence "would not change the outcome of the Board's final Decision and therefore is not material."[32]

Although the Board states in the *Oversight Decision* that Barrington's previous projections of 135-205 hour of increased daily delay were before it when it issued its *Final Decision*,[33] it never explained why delays of that magnitude are not material.  Instead, it lamely suggested that even if the U.S. Route 14 crossing had been found to be substantially affected under the total delay criterion, it would not have mattered because the Board denied grade separation relief at other crossings that also experienced additional delay in excess of 40 hours.  The Board simply ignored factors in its

---

[31] *Oversight Decision* at 10 (JA___).
[32] *Id.*
[33] *Oversight Decision* at 4, 10 (JA _, __).

original decision that show that the situations at such other crossings can be easily distinguished.

The Board's refusal to award grade separation to Barrington is largely attributed to the Board's persistent claim that it was adhering "to its general practice of not requiring applicants to mitigate preexisting conditions".[34]  However, that general practice was not applied to the crossings in Aurora and Lynwood.  Instead, when it recommended grade separation mitigation at those crossings, OEA specifically acknowledged that grade separations at those crossings "would address not only vehicle delay, but also both the substantial pre-existing traffic congestion and existing issues at each of those locations involving the level of service, risk profile, vehicle safety exposure, emergency response, and queue length backups."[35]  However, instead of denying relief in Aurora and Lynwood because of preexisting congestion, OEA concluded that it would "be reasonable to balance the benefit of reducing or eliminating these pre-existing issues against the increase in

---

[34] *Oversight Decision* at 11 (JA __).  The phrase "preexisting conditions" is repeated on 12 different pages of the decision.

[35] FEIS at 4-25 (JA _ _).

22

transaction-related traffic delay to reduce [CN's] contribution to these grade separations."[36]

Because Civiltech's 2011 VISSIM Study demonstrated that a single grade-separated crossing at U.S. Route 14 would benefit Barrington's two SRA routes without CN being asked to address preexisting congestion, a grant of grade separation mitigation to Barrington would not in any manner require the Board to deviate from its "general" practice.  Hence, the Board's continued reliance on preexisting congestion to support its refusal to grant grade separation at the U.S. Route 14 crossing is irrational and is reflective of the disparate treatment afforded the U.S. Route 14 crossing.

In refusing to reopen, the Board arbitrarily and capriciously continued to rely on the findings derived from HDR's unique 2008 peak-period analysis described in the VOBTOA.  That analysis, by disregarding the cumulative impact of all 24 hours of daily train operations, provided an inaccurate, incomplete and misleading assessment of the impact of the additional trains on site-specific crossings in Barrington.  Those errors caused the Board to conclude

---

[36] *Id.*

23

that the transaction would not considerably worsen traffic congestion or mobility as "the Barrington area total delay time would increase by 4% during the AM and PM peak periods."[37] Because Civiltech's 2011 VISSIM, which considered the impact of 24 hours of daily operation, has demonstrated multiple errors in the peak-period analysis that underlies that conclusion, the Board's continued reliance on that analysis in its *Oversight Decision* is arbitrary and capricious.

## STANDING

As a party of record in the STB proceeding, Barrington may "appear ... as of right ... in any action involving the validity of such order or requirement or any part thereof, and the interest of such party."  28 U.S.C. § 2323.  Because the STB arbitrarily applied disparate treatment to Barrington when it denied grade-separation relief and otherwise offered an explanation for its decision that runs counter to the new evidence before it, Barrington has standing, as a "party aggrieved," to petition for review.  5 U.S.C. § 702.

---

[37] *Final Decision* at 45, n.101 (J.A.____).

## ARGUMENT

### I.    Standard of Review

The Board's denial of additional mitigation pursuant to its oversight review jurisdiction in response to Barrington's new evidence reflecting CN's actual post-Acquisition operations is reviewed under the APA's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A).  Therefore, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281 (1974).  In addition, it must determine whether the Board "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Village of Barrington*, 636 F.3d at 630 (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Furthermore, in the context of the APA, arbitrary and capricious review and the substantial evidence test "'are one and the same' insofar as the requisite degree of evidentiary support is concerned." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 277, 243

25

(D.C. Cir. 2008)(Tatel, concurring) (quoting *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 422 (D.C. Cir.1986)).

Although a petition to reopen on the grounds of "material error" ordinarily would not be a valid basis for a petition for review, if it is clear that the purpose of a petition to reopen the proceeding on the grounds of "material error" is to show that the Board's decision was based on "inaccurate, incomplete and misleading information" provided to it in the original proceeding, the Board's decision not to reopen is subject to review "under the familiar arbitrary and capricious standard.  *See* 5 U.S.C. § 706(2)(A)." *Jost v. STB,* 194 F.3d 79, 85 (D.C. Cir. 1999); *accord Fritsch v.* ICC, 59 F.3d 248 (D.C. Cir. 1995).

## II.    In Its *Oversight Decision*, The Board Arbitrarily And Capriciously Failed To Take A Hard Look At Barrington's New Evidence That Is Based On CN's Post-Acquisition Operations Over The EJ&E Line And Demonstrates That The Adverse Impacts Of CN's Increased Operations In Barrington Are Virtually Identical To The Adverse Impacts At The Similarly Situated U.S. Route 34 Crossing In Aurora, Which Was Awarded Grade-Separation Mitigation In The Board's *Final Decision.*

**A.  Civiltech's 2011 VISSIM Study conclusively demonstrates that a single grade separation at the U.S. Route 14 crossing will benefit the Barrington transportation network by countering the adverse impact of CN's additional rail operations without requiring CN to mitigate any preexisting congestion.**

In its *Oversight Decision,* the Board never addressed the critical conclusions in Civiltech's 2011 VISSIM Study that "[r]ailroad crossing delays on U.S. Route 14 attributable to the Acquisition will be eliminated with construction of a grade separation, but the benefits will extend well beyond U.S. Route 14 itself.  IL Route 59 will see substantial benefits as well."[38] These findings are particularly significant given the fact that both IL Route 59 and U.S. Route 14 are designated SRA routes, which recognizes their importance to the region's mobility.[39]

Without any apparent analysis of these new conclusions, the Board defaulted back to its 2008 mindset and dismissed them with the comment that "[t]he Final EIS explained that a grade separation at U.S. 14 would have 'minimal benefit to traffic flow' in the area due to existing congestion caused by multiple nearby traffic signals,

---

[38] 2011 VISSIM at 15 (JA ___).
[39] As the Board has conceded, its "EIS did not discuss the status of U.S. 14 as an SRA" (*Oversight Decision* at 15).

27

as well as the nearby location of the UP/Metra rail line that created substantial queuing along Hough Street and U.S. 14."[40]  That assertion was later repeated when the Board stated that the VOBTOA Study "showed that a grade separation alone at U.S. 14 would not address regional congestion."[41]

The Board further contends that "as discussed in the VOBTOA Study, 'construction of a grade separation at [U.S. 14] would only be beneficial if capacity improvements are incorporated at the upstream and downstream signalized intersections.'"[42] That conclusion, which is repeated verbatim at p. 18 of the *Oversight Decision*, is repudiated by the 2011 VISSIM Study, which shows that with the construction of a grade separation at the U.S. Route 14 crossing, "[p]ost-Acquisition delays at the IL Route 59 CN crossing will be reduced by more than 50% because traffic flow across that crossing will no longer have to interact with the effects of simultaneous traffic flow interruptions on U.S. Route 14."[43] These projections reveal a fundamental flaw in the primary

---

[40] *Oversight Decision* at 12 (JA  __).
[41] *Id.* at 18 (JA  __).
[42] *Id.* at 12 (JA  ___).
[43] 2011 VISSIM at 15-16 (JA ___).

assumption that underlies the Board's reasoning and ultimate conclusion to not reopen.

Because Barrington's new evidence shows that these improvements to the network will be realized by constructing a single grade separation at U.S. Route 14 *without any other capacity improvements*, the Board is guilty of mixing apples with oranges when it claims that its conclusion "is consistent with Barrington's own 2011 study."[44]  Barrington acknowledges that the 2011 VISSIM shows that vehicle delay in the absence of additional trains will increase on U.S. Route 14.  However, because Barrington is not asking the Board to mitigate additional delays that are not attributed to additional trains, such delays do not in any fashion undercut the validity of the 2011 VISSIM finding that the increase on U.S. Route 14 of an additional 100 hours of daily delay -- attributed solely to the additional CN trains -- will be virtually eliminated by a grade separation, even if no other capacity improvements are implemented.

According to the Board, "the Final EIS concluded that while the additional trains on the EJ&E line as a result of the transaction

---

[44] *Oversight Decision* at 18 (JA ___).

would increase delay to some degree, they would not substantially modify the basic nature of the traffic congestion that motorists were already experiencing and would continue to experience in Barrington due to preexisting roadway capacity constraints."[45]  This final comment shows the Board also ignored the related key projection in Civiltech's 2011 VISSIM Study that a grade separation at the U.S. Route 14 crossing "would reduce 2015 total 24-hour vehicle delays on both IL Route 59 and U.S. Route 14 to nearly the levels expected under the No-Acquisition scenario."[46] Indeed, construction of the grade separation at the U.S. Route 14 crossing would fully mitigate CN impacts at the IL Route 59 crossing by reducing delays attributed to CN trains to 41 hours below the No-Action level of delay hours, even if no other steps are taken to adjust preexisting roadway constraints.  Therefore, even though pre-existing traffic congestion problems would not be resolved, a single grade separation at U.S. Route 14 would mitigate the impact of CN's increased train traffic.

---

[45] *Oversight Decision* at 12 (JA ____).
[46] 2011 VISSIM at 22 (JA ___).

30

Barrington respectfully submits that these key findings in Civiltech's post-Acquisition 2011 VISSIM Study are material and warrant full consideration and reopening.  However, without any apparent input from HDR (the Board's hired expert) that questioned the validity of Civiltech's 2011 VISSIM Study, the Board in its *Oversight Decision* relied on the pre-Acquisition peak-period evidence that underlies the 2008 VOBTOA.  That approach cannot be reconciled with the Board's stated intent to address matters related to operations following the transfer of control.

Furthermore, rather than recognizing that grade separation mitigation would prevent further congestion attributable to CN's increased operations, the Board reiterated its intent to adhere "to its consistent practice of not requiring mitigation for preexisting conditions."[47]  Had the Board taken a hard look and carefully analyzed Barrington's findings, it would have discovered that Barrington is *not* seeking relief for preexisting conditions.

The materiality of Barrington's new evidence can also be demonstrated by reference to the Board's Opening Brief before this Court in Case No. 09-1002.  In that brief, Board counsel outlined

---

[47] *Oversight Decision* at 13 (JA___).

31

the factors that caused the Board to award grade separations at the

U.S. Routes 30 (Lincoln Highway) and 34 (Ogden Avenue) crossings.

As stated at pages 48-49:

> [h]ere the Board found Ogden Avenue and Lincoln Highway: (1) met (or neared) two of the 11 factors (total vehicle delay and vehicle exposure);* (2) were designated by IDOT as Strategic Regional Arterials (a measure of their significance to regional mobility); (3) had the highest projected 2015 ADT of all crossings (Ogden Avenue's was 45,828 and Lincoln Highway's was 39,656); (4) already had signals in place; and (5) had no alternative grade-separated route available.* Moreover, the Ogden Avenue crossing was less than 1 mile north of Montgomery Avenue, the only other crossing where the vehicle exposure level would also exceed 1 million. Thus, this grade separation would help reduce safety concerns at Montgomery Avenue.* Also, the projected queue length at the Lincoln Highway crossing would block Sauk Trail, a major thoroughfare. (*Footnotes omitted).[48]

Barrington's new evidence supports the same conclusions that

the Board reached with respect to the U.S. Route 34 crossing.

First, U.S. Route 14, similar to the Ogden Avenue (U.S. Route 34)

crossing, would experience total delay of more than 40 hours per

day post-Transaction. Second, U.S. Route 14 (along with IL Route

59) has long been designated as a Strategic Regional Arterial by

---

[48] JA ___.

32

IDOT.  Third, U.S Route 14 has the third highest ADT of any of the roads that cross the EJ&E.  Fourth, signals are already in place. Fifth, U.S. Route 14 has no alternative grade-separated route available.

Moreover, because the Board denied grade-separation mitigation to IL Route 59, which OEA found was "substantially affected," a grade separation would help reduce safety concerns and congestion at that nearby crossing.  When the results shown at Tables 5-5 and 5-7 of the VOBTOA Study are measured on a map, the vehicle queues at U.S. Route 14 would block the IL Route 59 crossing in the A.M. peak hour, and would also block the Lake Cook Road intersection in the P.M. peak hour.  Neither of these adjacent roadways would be blocked in the 2015 No-Action scenario; thus the transaction would cause a "substantial effect" at the U.S. Route 14 crossing. However, unlike the situation at other crossings, the fact that the increased queue lengths would block a roadway that would not be blocked were it not for the increased train traffic was never mentioned in the VOBTOA.  Nor is there any mention of the fact that the U.S. Route 14 crossing would have the second longest

queue length of any grade crossing on the CN/EJ&E line once CN's freight traffic operations are fully implemented.[49]

The foregoing similarities conclusively demonstrate that Barrington's new evidence is material and cannot be ignored unless the goal is to accord disparate treatment to U.S. Route 14. If the totality of those factors justified Board-mandated grade separation mitigation measures at the crossings in Aurora and Lynwood, the totality of those factors that support equivalent mitigation at U.S. Route 14 cannot be summarily dismissed. If the Board had taken a hard look at the conclusions in Civiltech's 2011 VISSIM, rather than dismiss them out of hand, it would have recognized that CN's post-Transaction operations (especially changes that are not reflected in CN's application) warrant grade-separation relief at the U.S. Route 14 crossing.

Instead of taking a hard look at the projections in Civiltech's 2011 VISSIM Study, the Board declared that even if the evidence is new, it would not materially affect the outcome of the Board's Final Decision. To reach that conclusion, the Board arbitrarily and

---

[49] See, Attachment 1 to the 2011 Supplemental Verified Statement of Civiltech's Robert J. Andres. (JA ___).

improperly trivialized the revised projections that reflected 98-100 hours of additional delay, even after CN implemented CWT. According to the Board, because it denied grade separation when projected total delay was higher, it would necessarily do the same when total delay was reduced.  It is noteworthy that while the Board at pages 4 and 10 of its *Oversight Decision* accentuated the 2008 VISSIM projections of 135-205 hours of increased vehicular delay, and commented that those projections "were already before the Board when it issued the Final Decision,"[50] the Board never explained why Barrington's 2008 projections were never mentioned in the VOBTOA, the FEIS or the Board's *Final Decision,* especially when 100 hours of additional delay is 2.5 times higher than the 40-hour threshold OEA used to determine substantial effect.

**B.  Because Civiltech's 2011 VISSIM Study is the only evidence that reflects the actual impact of CN's post-Acquisition operations over the EJ&E line at the crossings at both U.S. Routes 14 and 34, it is both new and timely.**

Rather than address the findings in Civiltech's 2011 VISSIM that demonstrate the virtually identical impact of CN's increased operations on both the U.S. Route 14 crossing and the U.S. Route

---

[50] *Oversight Decision* at 10 (JA __).

35

34 crossing, the Board engaged in a diversionary tactic by suggesting that "Barrington could have presented its Ogden Avenue comparison, or a comparison to any other crossing recommended for mitigation in the Final EIS, to the Board after the Final EIS was issued."[51] The Board is being a bit disingenuous with this claim, as it well knows that the NEPA process it devised for the transaction did not provide for a public comment period on the FEIS.  In effect, the VOBTOA, contrary to the Due Process Clause, was used "in a way that foreclose[d] an opportunity to offer a contrary presentation."  *Bowman Transportation,* 419 U.S. at 288, n.4, citing *Ohio Bell Telephone Co. v. Public Utilities Comm'n,* 301 U.S. 292 (1937).

Pointing to Table XII-1 in Civiltech's 2011 VISSIM, which presents a compact visual comparison of the CN Railway Crossings of U.S. Route 14 in Barrington and U.S. Route 34 in Aurora, the Board says that:

> All of the information presented in Barrington's comparison chart presented in its recent filings* was available to Barrington either in the Final EIS or elsewhere prior to the Board's Final Decision, with the exception of the last row of the chart.  That

---

[51] *Oversight Decision* at 14 (JA ___).

row contains Barrington's calculations for increases in vehicle delay at U.S. 14 and Ogden Avenue in 2015.[52]

The Court must reject the Board's misleading spin. Although generalized information in Table XII-1, such as travel distance to the nearest alternate grade separation and U.S. Route 14's SRA designation was available before Barrington requested Civiltech to conduct its comparative 2011 VISSIM Study, the critical component of Table XII-1 is the last row. The figures in that row reveal the projected hours of delay at U.S. Route 14 and U.S. Route 34. They are the product of Civiltech's amended 2011 VISSIM Study that measured the impact of CN's post-Acquisition operations by inputting the times of day that CN trains actually occurred, the directions of approach, the lengths and the travel speeds that were observed from actual CN rail operations, as well as the actual gate-down times. Those figures could not have been developed at any point in time prior to the date that CN commenced operations.

If Barrington had attempted to engage in a comparative analysis of the Ogden Avenue crossing immediately following the service of the Board's *Final Decision* in 2008, it no doubt would

---

[52] *Id.* (*note omitted).

37

have been found to have acted prematurely consistent with the

Board reasoning applied to projected emissions at the Kirk and

Joliet Yards.  In its *Stay Decision,* served January 16, 2009, the

Board responded as follows to Barrington's objections about the

lack of evidence regarding projected emissions at the Kirk and Joliet

Yards:

> A more site-specific analysis of the Kirk and Joliet
> yards was not conducted because the information
> necessary for such an analysis was not available, as
> CN stated that it would not develop specific plans
> for reconfiguring those yards until it had gained
> experience operating the EJ&E system and those
> yards.  Accordingly, any attempted analysis of those
> effects in the Final EIS would have been
> speculative.  *Of course, once it is clear how the yards
> will be used, any specific concerns can be brought to
> the Board's attention during the oversight period.*[53]

The Board's reasoning applies with equal force to the instant

situation.  As was the case with the site-specific analysis of the Kirk

and Joliet yards, hard evidence regarding the actual impact of CN's

post-acquisition events, such as its implementation of CWT and its

scheduling of train operations, was not available until after CN

commenced operations over the EJ&E.  While the earlier 2008

VISSIM study questioned OEA's methodology in the DEIS,

---

[53] *Stay Decision*, at 9-10 (emphasis added)(JA___).

38

Barrington did not have access to any evidence that would have allowed it to anticipate the impact of future actions to be taken by CN that were not disclosed in CN's application, including CN's implementation of CWT, a matter that provides a prime example of an unanticipated impact of CN's post-Acquisition actions. As a result, Barrington had no choice but to await the commencement of CN's operations over the EJ&E before it could pursue additional relief during the oversight period. Furthermore, it would have been an absolute waste of time and resources to undertake a further VISSIM study at any point before this Court upheld the Board's decision requiring CN to pay a substantial portion of the cost of grade separations in Aurora and Lynwood.

Because the Board specifically retained "jurisdiction to impose additional conditions and take other action, if, and to the extent, the Board determines it is necessary to address matters related to operations following the transfer of control,"[54] Barrington was well within its rights in waiting until after CN had commenced operations over the EJ&E before undertaking the 2011 VISSIM study. Hence, the Board's current hindsight contention that

_____

[54] *Final Decision* at 26 (JA___).

39

expensive VISSIM modeling by Barrington at any number of crossings along the EJ&E could have been presented immediately following the issuance of the FEIS is nonsensical.

The 2011 VISSIM Study is the *only* evidence of record that definitively provides the Board with a verifiable apples-to-apples post-Acquisition comparison of the impact of CN's operations on the U.S. Route 14 grade crossing in Barrington with the impact on the U.S. Route 34 grade crossing at Aurora.  As such, Barrington's petition to reopen "was based on non-pretextual grounds of new evidence or changed circumstances and not merely on material error in the original agency decision." *Fritsch v. I.C.C.*, 59 F.3d at 252.

Because the head-to-head comparison of the two crossings is based on actual CN operations more than two years after it consummated its acquisition of EJ&E in 2009, the 2011 VISSIM Study is far more than a mere update of the original 2008 VISSIM conclusions that Barrington introduced to contest OEA's DEIS results.  As the impact attributed to CN's implementation of CWT circuitry demonstrates, unanticipated changes in operations have

40

substantial impacts, which is why the oversight condition was

imposed in the first place.

### C. The Board has not provided an adequate explanation to justify its irrational, disparate treatment of the U.S. Route 14 crossing vis-à-vis similarly situated crossings, particularly those at U.S. Routes 34 and 30.

As this Court explained in *Burlington Northern and Santa Fe*

*Railway Company v. Surface Transportation Board,* 403 F.3d 771,

776-7 (D.C. Cir. 2005):

> An agency must provide an adequate explanation to justify treating similarly situated parties differently. Petroleum Communications Inc. v. FCC, 22 F.3d 1164, 1172 (D.C.Cir.1994) (and cases cited therein); Willis Shaw Frozen Express Inc. v. ICC, 587 F.2d 1333, 1336 (D.C.Cir.1978); Ace Motor Freight, Inc. v. ICC, 557 F.2d 859, 862 (D.C.Cir.1977).   Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld. Willis Shaw Frozen Express, Inc., 587 F.2d at 1336; Ace Motor Freight, Inc., 557 F.2d at 862.

The Board's *Oversight Decision* fails to provide a reasoned

explanation for its disparate treatment of the U.S. Route 14

crossing when compared with the treatment afforded other like

crossings.  Indeed, it vividly demonstrates that the Board applied

41

different standards to the U.S. Route 14 crossing than were applied to other crossings, in particular the U.S. Route 34 crossing in Aurora.

In attempting to discredit Barrington's evidence, the Board claims that "exceeding the 40-hour traffic delay threshold did not automatically warrant any mitigation in the *Final Decision*, much less a grade separation."[55] Recognizing it could not simply ignore the fact that 98-100 hours of additional delay is more than double the 40-hour threshold criterion, the Board rationalized that because it denied grade separations to four "substantially affected" crossings that were projected to exceed the 40-hour total vehicle delay criterion, U.S. Route 14 is being treated in a similar fashion.

However, the U.S. Route 14 cannot be legitimately compared with several of these other crossings because, unlike them, it satisfies at least two of OEA's three threshold criteria.[56] By way of comparison (and as discussed in section 2.5 of the FEIS), Western

---

[55] *Oversight Decision* at 10 (JA __).

[56] The Montgomery Road/83rd Street crossing in Aurora exceeded two of the threshold criteria. However, OEA determined that a grade-separation was not warranted because it, unlike Route 14, had an alternative route created by the mitigation recommended for Ogden Avenue, which is less than a mile north of the Montgomery Road at-grade crossing.

42

Avenue in Park Forest did not exceed the other two threshold
criteria, and would experience reduced potential effects of the
transaction due to improvements proposed at the Matteson
connection.  Chicago Road in Chicago Heights did not exceed the
other two threshold criteria; and Broad Street in Griffith, IN did not
exceed the other two criteria and experienced existing crossing
delays due to seven railroad lines at that location.  In short,
because none of the above crossings met multiple OEA criteria, they
are not similar to U.S. Route 14 in Barrington.  Therefore, the
Board's decision not to award grade separation to them can have no
bearing on the decision to deny such relief to U.S. Route 14.

The Board also stated that the two crossings at which OEA
recommended a grade separation, Ogden Avenue and Lincoln
Highway, exceed the 40-hour total vehicle delay and "would also
exceed or nearly exceed the vehicle "exposure" threshold of one
million vehicles."[57]  However, the Lincoln Highway crossing did not
really exceed the vehicle exposure threshold.

Barrington acknowledges that there are four other
"substantially affected" crossings that actually satisfied at least two

---

[57] *Oversight Decision* at 11.

43

of OEA's thresholds that were not awarded grade crossing

separations.  In three instances, Woodruff Road and Washington

Street in Joliet, and Montgomery Avenue in Aurora, the Board's

articulated reasons for denying grade-separation are not subject to

challenge.  As the Board explained, the Woodruff Road and

Washington Street crossings could have qualified for recommended

grade-separation mitigation if Joliet had not negotiated an

agreement with CN early in the EIS process for the transaction.[58]

And as previously noted, the Board rationally explained that it

would not recommend grade separation at Montgomery Avenue due

to its close proximity to the Ogden Avenue crossing.

The same is not true with respect to the Board's treatment of

the U.S. Route 14 and the IL Route 59 crossings in Barrington.[59]

According to the Board, they were denied grade-separation

mitigation due to existing congestion and preexisting roadway

---

[58] Compare, *Oversight Decision* at 11-12 (JA ____) with *Final Decision* at 45 (JA ____).

[59] Although the Board authorized, subject to IDOT's approval, the installation of a traffic advisory sign at the IL Route 59 and U.S. Route 14 intersection advising motorists not to block it, CN reported in its Quarterly Environmental Report, 3rd Quarter, 2009, at 19 (JA ___), that "IDOT advises 'do not block intersection' signs unwarranted."

44

capacity constraints.  Those same conditions existed at the U.S.

Routes 30 and 34 crossings.  In awarding grade separation

mitigation at those crossings, however, OEA frankly acknowledged

that grade separations at U.S. Routes 30 and 34 "would address not

only vehicle delay, but also both the *substantial pre-existing traffic

congestion and existing issues at each of those locations* involving

the level of service, risk profile, vehicle safety exposure, emergency

response, and queue length backups."[60]  OEA also found that "the

vehicle delay effect at US 34 would only partly be the result of the

Proposed Action."[61]  The same was true regarding the U.S. Route 30

crossing.[62] Nevertheless, instead of denying relief because of

preexisting congestion, OEA concluded that it would "*be reasonable

to balance the benefit of reducing or eliminating these pre-existing

issues against the increase in transaction-related traffic delay to

reduce [CN's] contribution to these grade separations.*"[63]

    The Board's treatment of Barrington cannot be reconciled with

the foregoing reasoning.  Because Barrington's new evidence

---

[60] FEIS at 4-25 (emphasis added)(JA ___).
[61] FEIS at 4-16 (JA ___).
[62] FEIS at 4-22 (JA ___).
[63] FEIS at 4-25 (emphasis added)(JA___).

demonstrates that a single grade-separated crossing at U.S. Route 14 would remedy the impact of future congestion that is solely related to increased rail traffic without holding CN responsible for addressing preexisting congestion, there is, of course, no need to "balance" the benefits to Barrington's transportation network against CN's contribution.  Therefore, requiring CN to bear the cost of a grade separation at U.S. Route 14 would be wholly consistent with the Board's professed "practice of mitigating only impacts resulting directly from the transaction and not requiring mitigation for preexisting conditions and preexisting railroad operations."[64]  In any event, in light of the reality that the grade separation ordered in Aurora and Lynwood would alleviate some of those communities' preexisting traffic congestion that is not caused solely by CN's expanded operations, it is apparent that the Board is capable of relaxing its general practice of not requiring mitigation for preexisting conditions.

Disparate treatment is also reflected by the Board's treatment of the SRA designation.  Because U.S. Route 14's SRA designation was never mentioned in the DEIS or FEIS, its importance to the

---

[64] *Oversight Decision* at 6; *see also* at 13 (JA __, __).

46

region's mobility was never considered.  In the *Oversight Decision*,
the Board brushed aside that omission and the comparison with
U.S. Route 34 by stating that such a designation is not controlling.
In support, the Board notes that it denied grade separation relief to
the Hough Street crossing in Barrington (IL Route 59), which it
acknowledged is also a SRA route, "due to the preexisting
congestion in Barrington."[65]  Here again, the Board fixated on
"preexisting congestion" and ignored the evidence that shows that
CN is only being asked to address congestion caused by its
operations.

The Board's predilection to deny relief to Barrington also
caused it to ignore that alternate routes are not as readily available
in the vicinity of the U.S. Route 14 highway/rail at-grade crossing
as they are in the vicinity of the U.S. Route 34 crossing.  As
reflected in Table XII-1 of Civiltech's 2011 VISSIM, the travel
distance to the nearest alternate grade separation in Barrington is
4-6 miles, as compared with 2-3 miles in Aurora.  While this was
taken into account in granting grade-separation relief at the U.S.
Route 34 crossing, no consideration was given to this key factor in

---

[65] *Id.* at 16 (JA__).

47

the *Oversight Decision.*  Because a stalled train of average length can simultaneously block all four crossings in Barrington, distances to alternate crossings are of extreme significance.

Disparate treatment is also shown by the Board's failure to acknowledge substantial differences in Acquisition-induced vehicle queue lengths.  Although Table 2.5-3 of the FEIS predicted a queue-length increase at Ogden Avenue of only 247 feet as a result of the Proposed Action,[66] OEA found that a grade separation at Ogden Avenue "would address not only vehicle delay, but also … queue length backups".[67]

By way of comparison, increases in Acquisition-induced queue-length backups at U.S. Route 14 are seven to eight times greater than those predicted at Ogden Avenue.  Table 5-5 in OEA's VOBTOA predicted a 1,750-foot A.M. peak hour eastbound queue length increase (one-third of a mile) and a 2,100-foot P.M. peak hour westbound queue length increase (four tenths of a mile) at the U.S. Route 14 crossing.[68]  These results were predicted even though HDR's analyses did not consider the compounding effects of queues

---

[66] FEIS at 2-46 (JA ___).
[67] FEIS at 4-25 (JA ___).
[68] VOBTOA at 29 (JA ___).

48

from other train events and, in at least one instance, its analysis was truncated before the vehicle queue had fully dissipated.

In its *Oversight Decision*, the Board never considered whether a grade separation would benefit the Village's roadway network by lessening the impact of substantially increased queues associated with increased train traffic throughout the day.  Instead, it repeatedly attributed the vastly increased queue lengths to "high traffic volumes and a preexisting lack of capacity at the intersection of IL 59 and U.S. 14, rather than the transaction."[69] However, preexisting conditions do not explain away the increased blocking of additional crossings that is solely attributable to additional rail operations and that would be eliminated by a single grade separation at the U.S. Route 14 crossing.

### D.   The Board's focus on preexisting congestion caused it to fail to take a hard look at the *actual* environmental consequences of its oversight action.

The Board's adamant refusal to acknowledge the materiality of Barrington's new, post-transaction evidence is attributed to its penchant to deny Barrington relief based solely on preexisting congestion.  Instead of taking a forward leaning "hard look" at the

---

[69] *Oversight Decision* at 20 (J.A. __).

environmental consequences of its action in its *Oversight Decision*, the Board, insofar as the crossings in Barrington are concerned, irrationally focused on the wrong issue when it focused on the hours of projected delay under the No-Action Alternative (where no new CN trains would be added).[70]  By taking that approach, the Board erroneously ignored the new evidence that highlighted the actual environmental consequences of the anticipated fourfold increase in rail traffic moving through Barrington on a daily basis. As Barrington's new evidence shows, the increase in rail traffic will result in an additional 98 to 100 hours of total daily vehicular delay at the U.S. Route 14 crossing over and above the projected increase in total delay without the additional trains.[71]  The crossing at U.S. Route 34, based on the identical methodology, will similarly experience 114 more hours of daily delay.

---

[70] *Oversight Decision* at 12, 18-19 (JA __, __-__).

[71] Although the Board derisively dismissed the 100 hours of additional delay with the comment that the transaction would not "considerably worsen traffic congestion or mobility" (*Oversight Decision* at 18 (JA ___) and 12 (JA ___)), there can be no doubt that an increase of 100 hours of additional daily delay that are solely attributed to additional rail traffic will considerably worsen traffic congestion and mobility in the small Village of Barrington.

50

The Board did not focus on the similar increase in hours of delay in Barrington.  Instead, it highlighted only the anticipated increase in delay that will occur *without consideration of any new trains*.  However, that additional delay, with which Barrington's citizens must live, has nothing to do with the relevant issue of the *environmental consequences of the underlying transaction approved by the Board*.  In short, the Board failed to "examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. v. State Farm Mutual,* 463 U.S. 29, 43 (1983), quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962); *Bowman Transportation, Inc.,* 419 U.S. at 285.

In order to address the environmental consequences of the underlying transaction, the real issue, *which the Board avoided*, is whether a grade separation at the U.S. Route 14 crossing would alleviate the adverse impact of CN's increased operations.  As

Barrington's November 4, 2011 Rebuttal evidence (which the Board accepted) reflects, the answer is unequivocally "yes"![72]

### E. The Board has not identified any error in Barrington's projections regarding the impact of constructing a grade separation at the U.S. Route 14 crossing.

In the *Oversight Decision*, the Board has not identified any error in Civiltech's 2011 VISSIM projections.  Based on a generalized comment in CN's Reply that Barrington had assumed "that there will be no increase in average train speed after CN finishes its planned improvements on the line",[73] the Board suggests that Barrington's projections "do not take in account the improvements CN is currently implementing on the line, which will likely increase train speed and reduce delay."[74] That suggestion is made even though CN did not offer any evidence of any future planned improvement in the vicinity of Barrington that would foster

---

[72] Because Barrington is satisfied that a single grade separation at the U.S. Route 14 crossing would alleviate most of the congestion attributed to CN's increased operation at both of those crossings, it has not sought multiple grade separations.  This approach is consistent with OEA's determination that, because a grade separation at U.S. Route 34 would address congestion issues at the nearby Montgomery Road crossing in Aurora, no mitigation would be proposed for the Montgomery Road crossing.  FEIS at 2-43.

[73] CN Reply at 14, n.28.

[74] *Oversight Decision* at 13 (JA __).

increased speeds.  While CN offered testimony regarding its implementation of CWT, it did not offer any testimony that higher speeds through Barrington will ever be achieved.

Because it swallowed CN's comments "hook line and sinker" and subsequently regurgitated them in the *Oversight Decision*, the Board ignored the impact of CN's voluntary agreement to give priority to the 62 commuter trains that operate on a daily basis during the week on the UP rail line,[75] which frequently compels CN trains to stop before proceeding through Barrington.  The voluntary agreement reflects the fact that CN must cross over the UP line at a diamond (which is the rail/rail at-grade intersection with the UP line) located in the center of Barrington.  Without question, this factor will tend to keep CN train speeds at the levels that Civiltech reported in the 2011 VISSIM and prevent CN from achieving the 39 mph speed projected in the FEIS.[76]  As graphically explained in the DEIS, after coming to a stop at the absolute signal at Lake Zurich

_____

[75] *Final Decision,* VM 38 at 64 (JA ___); see FEIS at 2-115 (JA ___) and Table 2.13-1 at FEIS at 2-113 (JA ___).  In addition, 24 passenger trains operate on Saturdays and 15 Sunday. Furthermore, approximately 7 UP freight trains also use the intersecting UP track on a daily basis.

[76] FEIS App. A at 489 (Table 4.3-5)(JA ___).

Road to receive a proceed indication, it will take between 4 and 6.5 minutes to reach 30 mph.[77]  By that time, the train would have long since passed the U.S. Route 14 crossing, which is less than a quarter mile south of Lake Zurich Road.  Plainly, the Board's unquestioning reliance on an unsupported comment in a self-serving CN footnote rather than on uncontested evidence of record is arbitrary and capricious.

Nor is there any merit to the Board's assertion that "Barrington has not presented sufficient evidence to show that the train schedule for six trains in 2011 will correlate to the schedule for 20 trains in 2015."[78]  As Robert J. Andres, a Principal Engineer and Senior Project Manager for Civiltech who supervised the preparation of the 2011 VISSIM Study, explained, Civiltech's 2011 study was not intended to tie CN to any set operating schedule. Instead, it was only:

> intended to demonstrate the 2015 delay impacts of today's CN rail operating characteristics, the sensitivity of those delay impacts to longer trains, and the substantial delay reduction impacts that would result from a grade separation at U.S. Route

---

[77] DEIS, Appendix B, Attachment B5 at 3 (JA ___).

[78] *Oversight Decision* at 13 (JA___).

14 even without improvements at nearby intersections.[79]

In other words, rather than speculate about potential future improvements that could be made either by CN or Barrington, Civiltech's study focused on the evidence in hand. The key point is that Civiltech's study, by focusing on CN's actual operational data and factoring in 20 trains a day, provided the Board with projections that are far more accurate than HDR's peak-period analysis upon which the Board continues to rely. In stark contrast, HDR's analysis measured only a portion of the impact of 2 trains per day that would operate during times in "which CN observes voluntary curfews on freight train movements due to the high levels of commuter train traffic on the UP line."[80]

## III.   In Light Of The Uncontested Evidence Of Record That Demonstrated That Prior Findings Were Based On Inaccurate, Incomplete And Misleading Information, The Board's Refusal to Reopen Pursuant To Its Governing Regulations And Oversight Jurisdiction Is Arbitrary and Capricious.

Because the VOBTOA, which reflects the results of HDR's peak-period analysis, was released simultaneously with the FEIS at

---

[79] R.V.S. Andres at 17-18 (JA ___).
[80] 2011 VISSIM at 6 (JA __).

the tail end of the original proceeding, and because the Board's procedures adopted for the proceeding did not provide an opportunity to reply to the FEIS, no opportunity existed to analyze and challenge HDR's analysis before the Board prior to the transaction's approval. As a result, when it asked Civiltech to prepare a post-Acquisition 2011 VISSIM, Barrington also asked Civiltech to analyze the findings in the VOBTOA to determine whether HDR's peak-period analysis accurately projected the actual impact on U.S. Route 14 of CN's post-Acquisition operations.

Barrington's new evidence identified multiple significant material errors and omissions in the VOBTOA that are attributed to incorrect, unsupported and misleading information. First, the A.M. and P.M. peak hours that HDR used in its VOBTOA analysis "are unrepresentative times to measure CN train delays because they are times of voluntary CN train curfews."[81] As was also testified, "[l]imiting the analysis to two separate peak hours of the day also stripped the ability of VISSIM to measure the cumulative delay impacts of multiple train events on the two rail lines."[82] Third,

---

[81] V.S. Andres at 4 (JA ____);  2011 VISSIM at 6 (JA ____).

[82] V.S. Andres at 4-5 (JA __).

56

"HDR's focus solely on A.M. and P.M. peak hours, rather than on a 24-hour period, vastly understated the total delay time attributed to CN's increased freight rail service and did not capture the compounding effect of twenty trains over an entire 24-hour period."[83]  Fourth, as Andres also testified, the 2011 VISSIM "revealed that HDR compounded its analysis error by averaging vehicle delays over all 5.8 miles of Village streets contained in the HDR VISSIM model."[84]  Moreover, "[b]y including roadway segments that are far removed from the EJ&E crossings, HDR further diluted the impact of additional CN freight traffic in the Village."[85]

In addition, Civiltech specifically questioned OEA's conclusion that HDR's "traffic analysis also validated [OEA's] methodology for evaluating traffic delay and mobility effects."[86]  As Civiltech explained, that "conclusion was reached despite the fact that HDR's analysis did not validate any 24-hour DEIS delay results at crossings in Barrington that were calculated using [OEA's]

---

[83] V.S. Andres at 5 (JA ___).
[84] *Id.* (JA ___)
[85] *Id.*
[86] 2011 VISSIM at 6 (JA __).

57

rudimentary analysis procedure."[87]  Civiltech also questioned how HDR could rationally conclude that congestion "will not considerably worsen" when HDR's VISSIM analyses "predicted queue length increases of 1,550 feet and 2,100 feet on Hough Street and U.S. Route 14 respectively."[88]

Last, Civiltech questioned the unexplained and untested conclusion that "the Barrington area total delay time would increase by 4% and 5% during the AM and PM peak periods."[89] As Mr. Andres explained in his opening Verified Statement, "[w]ithout a sophisticated understanding of the VISSIM program, readers of the VOBTOA who are not familiar with the VISSIM process would likely fail to appreciate that the program was narrowly applied and the results were reported in a misleading manner."[90]  As he also noted, "without that specialized knowledge, most readers would erroneously conclude that the VOBTOA proved that there would be little impact from additional freight train traffic in Barrington (i.e.

---

[87] *Id.*

[88] *Id.*

[89] *Final Decision* at 45, n.101.

[90] V.S. Andres at 5 (JA ____).

only a 4% to 5% increase) and that the VOBTOA validated the
rudimentary analysis procedure used in the FEIS."[91]

### A. The Board's refusal to acknowledge the inaccurate, incomplete and misleading information in the VOBTOA is arbitrary and capricious.

In responding to the allegations of material errors, the Board
made little or no effort to refute the merits of Civiltech's charges.
Instead, it first asserts that even if HDR's peak-period analysis did
not measure "traffic delay during a 24-hour period, as the Board
did for other crossings on the EJ&E rail line,"[92] the disparate
treatment should be disregarded because "the peak study in the
VOBTOA Study was not in lieu of, but in addition to, the analysis
conducted for all 87 crossings."[93]  The Board's position clearly
disregards the fact that if "extra" consideration in the form of the
flawed peak-period analysis methodology distorted the Board's
evaluation of the actual adverse impact that CN's increased
operations will have at the U.S. Route 14 crossing in Barrington,
the Board should address the distortion and correct it.  The Board
did not do so.  Instead, it arbitrarily chose to continue to rely on the

---

[91] *Id.* at 5-6.
[92] *Oversight Decision* at 16 (JA ___).
[93] *Id.*

59

disputed findings in the 2008 VOBTOA without addressing Civiltech's explicit charge that "the HDR analysis was narrowly defined and fell short of what is needed to fully assess impacts because HDR failed to model 24 hours of traffic operation."[94]

Rather than offering any technical data from HDR to counter Civiltech's charges regarding the deficiencies of the unique peak-period approach, the Board next claims that HDR's peak period analysis "was in direct response" to Barrington's DEIS Comments. That claim, which was repeated at least nine times throughout the *Oversight Decision*,[95] seriously distorts the record and explicitly conflicts with HDR's introductory comment in the VOBTOA that it undertook the 2008 VISSIM Study in response to concerns expressed by "[p]ublic meeting commenters and local government officials."[96]  It also conflicts with HDR's statement that it commenced collection of data to be used in its VISSIM in September 2008 before Barrington filed its DEIS Comments on September 30,

---

[94] 2011 VISSIM at 4 (JA ___).

[95] *See Oversight Decision at* pp. 4-5, 6, 8, 12,13, 14,16, 17, 18 n.88),

[96] VOBTOA at 1 (JA ___).

2008.[97]  Furthermore, if HDR's VISSIM analysis was intended to respond to Barrington's Comments, why were Barrington's DEIS Comments and projections never mentioned in the VOBTOA?

In its DEIS Comments,[98] Barrington commented that if OEA "had used the [Highway Capacity Manual] method[,] the DEIS would have analyzed *peak hour* conditions of roadways and thereby properly accounted for variance in traffic volume."[99] That comment merely voiced Barrington's criticism of the DEIS analysis for assuming an isolated and idealized crossing where the daily traffic volume flows over the crossing at a constant rate throughout the entire day.  Barrington never suggested that a peak period analysis be performed that would account for only two hours of the day and eliminate consideration of the other 22 hours of the day.

In its next attempt to justify the peak-period analysis, the Board suggests that "by setting peak hours as a parameter, the VOBTOA Study properly took into account the projected realistic conditions during those hours, which include a reduction of freight

---

[97] VOBTOA at 10 (JA ___).

[98] *See* Barrington DEIS Comments (JA __-__).

[99] *Id.* at 35 (emphasis in original)(JA ___).

61

rail traffic to allow for commuter trains."[100] The Board's reasoning totally misses the point that even if it may be true that the study accurately simulated vehicular and freight train traffic during two hours of the day, it failed to simulate the compounding effect and impact of the other 18+ trains that are projected to pass through the Village during the remaining 22 hours of the day.[101]

In yet another attempt to avoid having to address Civiltech's challenges regarding the various flaws in HDR's peak period analysis, the Board insists that Barrington lacked "supporting evidence" to support its argument that HDR's VISSIM methodology was narrowly applied so results would appear to confirm previous conclusions.[102] Simply stated, there is no other rational explanation for creating a model that would flat out ignore 22 hours of the day. Barrington submits that if HDR had been asked in response to

_____

[100] *Oversight Decision* at 17 (JA ___).

[101] The peak-period analysis can be likened to a weatherman making a weather report by looking out the window once in the morning and once in the afternoon. If it happened to be sunny both times, the report would read it was sunny today. If he had looked out the window every hour of the same day and determined that for all but two hours of the day, it was cloudy with periods of rain, he would accurately report the weather today was mostly cloudy with periods of rain.

[102] *Oversight Decision* at 17 (JA ____).

Civiltech's 2011 post-Acquisition VISSIM Study to perform a 24-hour VISSIM study that focused on specific crossings, it would have likely reached the same results as Civiltech.

Although it claimed that it "understood the purpose and intent of the VOBTOA Study,"[103] the Board did not explain how the results of the unique peak-period analysis could trump the results of Civiltech's post-Acquisition 2011 VISSIM Study. Furthermore, the Board failed to explain how HDR's peak-period results could have possibly validated the rudimentary analysis procedure used in the DEIS. Instead, it ducked the issue with the comment that "in seeking to 'validate the analysis in the Draft EIS,'* OEA decided to perform additional analysis regarding whether U.S. 14 (and Hough Street) would be 'substantially affected' crossings by examining the potential impacts on the Barrington region during rush hour."[104]

If "validation" of the DEIS was the objective, HDR would have calculated the hours of total vehicle delay at U.S. Route 14 and the other specific crossings in Barrington. It did not do so. Instead, it measured only the increased "network-wide total delay time" during

---

[103] *Id.*

[104] *Id.* at 17 (JA __)(footnote omitted).

63

the AM and PM peak periods.  Despite the Board's assertion that "changes to the outer margins of the study area should not significantly affect the results,"[105] total network delay is really a meaningless number because the magnitude of the percent change depends upon how extensive the overall model was and how much local street detail was included within the model boundaries.  A larger overall model would include more background (i.e. non-rail) traffic delays that occur further from the CN crossings.  This would result in a smaller percentage change in total network delay due to a change in rail traffic.[106]

Furthermore, as a result of abruptly shifting from a crossing-specific analysis to an area-wide analysis, the finding related to the projected overall percentage increase in AM and PM peak-hour

_____

[105] *Id.* at 18 (JA ___).

[106] By way of analogy, if 20 inhabitants move into 10 new homes on a street with a preexisting population of only 2 inhabitants living in a single house, that increase in population would greatly affect that particular street.  However, in terms of the entire town of 20,000 inhabitants, the increase of 20 inhabitants would be insignificant.  Essentially, by taking the "area-wide" approach rather than a crossing-specific approach with respect to the Route 14 crossing, OEA minimized the specific impact on the U.S. Route 14 crossing and, thereby, subjected it to disparate treatment when compared with all other crossings analyzed by OEA.

congestion had nothing to do with the transaction's impact on the US Route 14 crossing.  Hence, the FEIS did not incorporate any of the VOBTOA VISSIM analysis results in the delay calculations for rail crossings in Barrington to determine substantial effect, but relied instead on the rudimentary delay methodology used previously in the DEIS.  Because the VOBTOA did not project any hours of delay for any crossing, there is no basis to correlate HDR's Barrington-related VISSIM analysis reported in the VOBTOA with the delay calculations in Table A.5-1 of the FEIS, which focused on specific crossings.

In the final analysis, exactly how the peak-period analysis "validated" the DEIS projections remains an unsolved mystery.  It is impossible to discern how the Board could extrapolate the impact on the U.S. Route 14 from the peak-hour analysis.  As this Court explained in *AT&T Wireless Services, Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001), "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review."

**B.    In responding to the methodological errors identified by Civiltech, the Board distorts the record and Barrington's position.**

In responding to Barrington's observations regarding Table A.5-1 of the FEIS, the Board mischaracterizes Barrington's position by saying that "Barrington asserts that, in Table A.5-1 in the VOBTOA, HDR incorrectly calculated the percent increase in total vehicle traffic delay over a 24-hour period."[107]  First, although Civiltech did question the percentage changes, it did not link Table A.5-1 to the VOBTOA.  Table A.5-1, *which is part of Appendix A to the FEIS*, was simply an update to the results of OEA's "site-specific" analysis "for each highway/rail at grade crossing" in Table 4.3-4 of the DEIS.[108]  Because the VOBTOA does not contain any projections of the hours of increased daily delay at any of the Barrington crossings, or for any of the other 89 crossings in Indiana and Illinois listed in Table A.5-1, there is no relationship between the hours of delay data published at Table A.5-1 under the subheading in that Table entitled "Total Vehicle Traffic Delay" and Table 5-5 in the VOBTOA, which reflects "Maximum Queue

---

[107] *Oversight Decision* at 19 (J.A. __).
[108] DEIS at 4.3-11 (JA ___).

66

Lengths," but does not mention hours of delay.[109]   In particular, attention is invited to the projected Proposed Action queue length at U.S. Route 14 of 1,057 feet in Table A.5-1 with the VOBTOA projection of 3,700 feet at Table 5-5. That comparison of the respective queue lengths reflects an unexplained differential of 250% in projected queue lengths.  Given that differential, any suggestion that the VOBTOA validated the analysis in the DEIS does not survive critical scrutiny.

Second, although the Board admitted the mathematical error in the percentage calculations of total vehicle traffic delay in Table A.5-1 when it commented that "total hours of delay, not the percentage increase, is the relevant criterion,"[110] the Board never explains how a percentage increase in daily delay of l,177% could possibly be reconciled with the 4% and 5% area-wide increases predicted by HDR's peak-period analysis which wholly failed to focus on any specific crossing.  Furthermore, it ignored the fact that Civiltech's projected increase in total daily hours of delay was more than double the 40-hour threshold.

---

[109] Compare FEIS App. A at 103 (JA __) with VOBTOA at 29 (JA __).

[110] *Oversight Decision* at 19 (JA ___).

67

## CONCLUSION

This Court should reverse and remand the Board's *Oversight Decision* on the grounds that the Board failed to take a hard look at the new evidence that not only demonstrates the substantial impact of the Transaction on the U.S. Route 14 crossing, but also shows that a single grade separation will have a beneficial impact on the Barrington transportation network.  This Court should also find that the Board has failed to provide a reasonable basis for its disparate treatment of the U.S. Route 14 crossing as compared with the similarly situated U.S. Route 34 crossing for which the Board properly awarded grade separation mitigation.  Last, the Board should find that the Board erred by refusing to reopen its decision in the face of uncontroverted new evidence that demonstrated that the information upon which the Board continues to rely was inaccurate, incomplete and misleading.

Respectfully submitted,

/s/ Richard H. Streeter
Law Office of Richard H. Streeter
5255 Partridge Lane, N.W.
Washington, D.C. 20016
(202) 363-2011
Counsel for Village of Barrington, IL

Dated:  April 26, 2013

68

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (2)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14-point Bookman Old Style font.

I further certify that this brief complies with the 14,000 word limitation of Fed. R. App. 32(a)(7)(B)(i), because this brief contains **13,033** words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1).

/s/ Richard H. Streeter

Attorney for Village of Barrington, IL

Dated:  April 26, 2013

**STATUTORY AND REGULATORY ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 702 ................................................................. ADD- 1

5 U.S.C. § 706 ................................................................. ADD- 2

28 U.S.C. § 2321 ............................................................. ADD- 3

28 U.S.C. § 2323 ............................................................. ADD- 4

28 U.S.C. § 2342(5) ......................................................... ADD- 6

28 U.S.C. § 2344 ............................................................. ADD- 7

28 U.S.C. § 2349 ............................................................. ADD- 8

42 U.S.C. § 4332 ............................................................. ADD- 9

49 U.S.C. § 722 ..............................................................ADD-13

49 U.S.C. § 11324 ...........................................................ADD- 14

## Regulations

49 C.F.R. § 1115.4 ..........................................................ADD- 17

# STATUTES

## 5 U.S.C. § 702.  Right of Review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein

(1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or

(2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

### 5 U.S.C. § 706.  Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be—

    (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B)  contrary to constitutional right, power, privilege, or immunity;

    (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D)  without observation of procedure required by law;

    (E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F)  unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**28 U.S.C. § 2321  Judicial review of Boad's orders and decisions; procedure generally; process.**

(a)Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or order of the Surface Transportation Board shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title.

(b)The procedure in the district courts in actions to enforce, in whole or in part, any order of the Surface Transportation Board other than for payment of money or the collection of fines, penalties, and forfeitures, shall be as provided in this chapter.

(c)The orders, writs, and process of the district courts may, in the cases specified in subsection (b) and in enforcement actions and actions to collect civil penalties under subtitle IV of title 49, run, be served and be returnable anywhere in the United States.

**28 U.S.C. § 2323  Duties of Attorney General; intervenors.**

The Attorney General shall represent the Government in the actions specified in section 2321 of this title and in enforcement actions and actions to collect civil penalties under subtitle IV of title 49.

The Surface Transportation Board and any party or parties in interest to the proceeding before the Board, in which an order or requirement is made, may appear as parties of their own motion and as of right, and be represented by their counsel, in any action involving the validity of such order or requirement or any part thereof, and the interest of such party.

Communities, associations, corporations, firms, and individuals interested in the controversy or question before the Board, or in any action commenced under the aforesaid sections may intervene in said action at any time after commencement thereof.

The Attorney General shall not dispose of or discontinue said action or proceeding over the objection of such party or intervenor, who may prosecute, defend, or continue said action or proceeding unaffected by the action or nonaction of the Attorney General therein.

**28 U.S.C. § 2342(5)  Jurisdiction of court of appeals.**

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

. . .

(5) all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

. . .

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

**28 U.S.C. § 2343  Venue**

The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

## 28 U.S.C. § 2344  Review of orders; time; notice; contents of petition; service

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of—

(1) the nature of the proceedings as to which review is sought;
(2) the facts on which venue is based;
(3) the grounds on which relief is sought; and
(4) the relief prayed.

The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the agency and on the Attorney General by registered mail, with request for a return receipt.

## 28 U.S.C. § 2349  Jurisdiction of the proceeding

(a)The court of appeals has jurisdiction of the proceeding on the filing and service of a petition to review. The court of appeals in which the record on review is filed, on the filing, has jurisdiction to vacate stay orders or interlocutory injunctions previously granted by any court, and has exclusive jurisdiction to make and enter, on the petition, evidence, and proceedings set forth in the record on review, a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency.

(b)The filing of the petition to review does not of itself stay or suspend the operation of the order of the agency, but the court of appeals in its discretion may restrain or suspend, in whole or in part, the operation of the order pending the final hearing and determination of the petition. When the petitioner makes application for an interlocutory injunction restraining or suspending the enforcement, operation, or execution of, or setting aside, in whole or in part, any order reviewable under this chapter, at least 5 days' notice of the hearing thereon shall be given to the agency and to the Attorney General. In a case in which irreparable damage would otherwise result to the petitioner, the court of appeals may, on hearing, after reasonable notice to the agency and to the Attorney General, order a temporary stay or suspension, in whole or in part, of the operation of the order of the agency for not more than 60 days from the date of the order pending the hearing on the application for the interlocutory injunction, in which case the order of the court of appeals shall contain a specific finding, based on evidence submitted to the court of appeals, and identified by reference thereto, that irreparable damage would result to the petitioner and specifying the nature of the damage. The court of appeals, at the time of hearing the application for an interlocutory injunction, on a like finding, may continue the temporary stay or suspension, in whole or in part, until decision on the application.

**42 U.S.C. § 4332  Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible:

(1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and

(2) all agencies of the Federal Government shall—

   (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

   (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

   (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

      (i) the environmental impact of the proposed action,

      (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

      (iii) alternatives to the proposed action,

**ADD- 9**

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

**ADD- 11**

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

**ADD- 12**

**49 U.S.C. § 722  Board Action**

(a) Effective Date of Actions. - Unless otherwise provided in subtitle IV, the Board may determine, within a reasonable time, when its actions, other than an action ordering the payment of money, take effect.

(b) Terminating and Changing Actions. - An action of the Board remains in effect under its own terms or until superseded.  The Board may change, suspend, or set aside any such action on notice. Notice may be given in a manner determined by the Board. A court of competent jurisdiction may suspend or set aside any such action.

(c) Reconsidering Actions. - The Board may, at any time on its own initiative because of material error, new evidence, or substantially changed circumstances –
　　　(1) reopen a proceeding;
　　　(2) grant rehearing, reargument, or reconsideration of an action of the Board; or
　　　(3) change an action of the Board.

An interested party may petition to reopen and reconsider an action of the Board under this subsection under regulations of the Board.

(d) Finality of Actions. - Notwithstanding subtitle IV, an action of the Board under this section is final on the date on which it is served, and a civil action to enforce, enjoin, suspend, or set aside the action may be filed after that date.

**ADD- 13**

## 49 U.S.C. § 11324.  Consolidation, merger, and acquisition of control; conditions of approval

(a)The Board may begin a proceeding to approve and authorize a transaction referred to in section 11323 of this title on application of the person seeking that authority. When an application is filed with the Board, the Board shall notify the chief executive officer of each State in which property of the rail carriers involved in the proposed transaction is located and shall notify those rail carriers. The Board shall hold a public hearing unless the Board determines that a public hearing is not necessary in the public interest.

(b)In a proceeding under this section which involves the merger or control of at least two Class I railroads, as defined by the Board, the Board shall consider at least—

(1)the effect of the proposed transaction on the adequacy of transportation to the public;

(2)the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction;

(3)the total fixed charges that result from the proposed transaction;

(4)the interest of rail carrier employees affected by the proposed transaction; and

(5)whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region or in the national rail system.

(c)The Board shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Board may impose conditions governing the transaction, including the divestiture of parallel tracks or requiring the granting of trackage rights and access to other facilities. Any trackage rights and related conditions imposed to alleviate

**ADD- 14**

anticompetitive effects of the transaction shall provide for operating terms and compensation levels to ensure that such effects are alleviated. When the transaction contemplates a guaranty or assumption of payment of dividends or of fixed charges or will result in an increase of total fixed charges, the Board may approve and authorize the transaction only if it finds that the guaranty, assumption, or increase is consistent with the public interest. The Board may require inclusion of other rail carriers located in the area involved in the transaction if they apply for inclusion and the Board finds their inclusion to be consistent with the public interest.

(d)In a proceeding under this section which does not involve the merger or control of at least two Class I railroads, as defined by the Board, the Board shall approve such an application unless it finds that—

(1)as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

(2)the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

In making such findings, the Board shall, with respect to any application that is part of a plan or proposal developed under section 333(a)–(d) of this title, accord substantial weight to any recommendations of the Attorney General.

(e)No transaction described in section 11326(b) may have the effect of avoiding a collective bargaining agreement or shifting work from a rail carrier with a collective bargaining agreement to a rail carrier without a collective bargaining agreement.

(f)
(1)To the extent provided in this subsection, a proceeding under this subchapter relating to a transaction involving at least one Class I rail carrier shall not be considered an adjudication required by statute to be determined on the record after opportunity

**ADD- 15**

for an agency hearing, for the purposes of subchapter II of chapter 5 of title 5, United States Code.

(2)Ex parte communications, as defined in section 551(14) of title 5, United States Code, shall be permitted in proceedings described in paragraph (1) of this subsection, subject to the requirements of paragraph (3) of this subsection.

(3)
(A)Any member or employee of the Board who makes or receives a written ex parte communication concerning the merits of a proceeding described in paragraph (1) shall promptly place the communication in the public docket of the proceeding.

(B)Any member or employee of the Board who makes or receives an oral ex parte communication concerning the merits of a proceeding described in paragraph (1) shall promptly place a written summary of the oral communication in the public docket of the proceeding.

(4)Nothing in this subsection shall be construed to require the Board or any of its members or employees to engage in any ex parte communication with any person. Nothing in this subsection or any other law shall be construed to limit the authority of the members or employees of the Board, in their discretion, to note in the docket or otherwise publicly the occurrence and substance of an ex parte communication.

## REGULATIONS

## 49 C.F.R. § 1115.4  Petitions to reopen administratively final actions.

A person at any time may file a petition to reopen any administratively final action of the Board pursuant to the requirements of § 1115.3 (c) and (d) of this part. A petition to reopen must state in detail the respects in which the proceeding involves material error, new evidence, or substantially changed circumstances and must include a request that the Board make such a determination.

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of April, 2013, I electronically filed the foregoing Opening Brief of Petitioner with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to registered CM/ECF users.  In addition, paper copies were filed with the Court and served by first class mail, postage prepaid, or hand delivery, to counsel designated with an asterisk (*).

Theodore L. Hunt*
Raymond A. Akins, General Counsel
Craig M. Keats, Deputy General Counsel
Surface Transportation Board
Office of General Counsel
395 E St., S.W., Room 1260
Washington, D.C. 20423-0001

Mary Gabrielle Sprague*
Aaron P. Avila
U.S. Dept. of Justice
Environmental & Natural Resources Division
Appellate Section
P.A. Box 7415
Washington, DC 20044

Paul A. Cunningham*           Theodore K. Kalick
David A. Hirsh               CN
HARKINS CUNNINGHAM LLP        Suite 500 North Building
1700 K Street, N.W., Suite 400  601 Pennsylvania Ave., N.W.
Washington, D.C. 20006-3804   Washington, D.C. 20004-3608


/s/ Richard H. Streeter
Counsel for Village of Barrington, IL